UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Justin Roseman,

    Plaintiff,

v.                                      Case No. 18-12474

Sam's East, Inc.,                 Sean F. Cox
                                                United States District Court Judge

    Defendant.
_____/

## OPINION AND ORDER GRANTING SAM'S EAST'S MOTION FOR SUMMARY JUDGMENT

In this employment action, a 6'7" African American employee sued his former employer under state law for discrimination based on his height and race. He also alleges that his employer retaliated against him for resisting this discrimination and exercising his rights under Michigan's worker's compensation statute. The employer now moves for summary judgement. For the reasons below, the Court will grant this motion and enter judgment in favor of the employer.

## BACKGROUND

Plaintiff Justin Roseman is an African American man who is 6'7" tall. (Roseman Dep. 8:2-7). In early August 2016, Roseman applied for both full-time and part-time work with Defendant Sam's East, Inc., which owned and operated a retail warehouse club (i.e. a Sam's Club)[1] in Southgate, Michigan. (Pl.'s Res., Ex. 2). Sam's Club hired Roseman as a part-time Overnight Merchandiser. (Pl.'s Res. Ex. 3). As an overnight merchandiser, Roseman stocked shelves in the "hardlines"

---

[1] For the purposes of this opinion, the Court will refer to Defendant Sam's East as "Sam's Club."

1

section of the warehouse, and was responsible for three to four aisles. (Bezzo Dep. 189:9-24). He reported to Overnight Supervisor Corey Williams, who in turn reported to Overnight Manager Kevin Bezzo. (Roseman Dep. 88:21-89:3). While Roseman worked nights at Sam's Club, he continued his day job as a part-time lot associate at Home Depot. (Roseman Dep. 19:20-21:11).

According to Roseman, his employment with Sam's Club soured quickly. Early on, he approached Bezzo to discuss some job-related concern and Bezzo greeted him by saying, "What the hell do you want?" (Roseman Dep. 85:8-12). About a month later, Bezzo again responded to Roseman's initiation of a work conversation with "What the hell do you want?" (Roseman Dep. 85:13-15).

On top of his boss's rudeness, Roseman was quickly overwhelmed by his work load. To stock his assigned shelves, Roseman would unload pallets that were dropped off by forklifts at the end of his aisles. On his first day, he received assistance from another associate. (Roseman Dep. 190:13-18). After that, he did not receive any assistance. *Id*. However, Roseman noticed that shorter, Caucasian associates received assistance even when they were assigned fewer aisles. (Roseman Dep. 191:5-14). This lack of assistance resulted in Roseman having "more work" than his shorter, Caucasian co-workers. Sometimes this increased workload meant that Roseman would have to work past the end of his scheduled shift, or that he would have to leave to start his shift at Home Depot without completing all of his work at Sam's Club.

Roseman began to believe that he was being targeted because of his height and race. Bezzo required Roseman to reduce pallet stacks from eight pallets high to six pallets high. (Roseman Dep. 87:8-88:8). But other associates, such as Jeremy Webb, were not required to make this reduction. *Id*. And Roseman believed that Bezzo had assigned a new forklift driver to his aisle, and instructed

2

the new driver to drop off too many products for Roseman to stock. (Roseman Dep. 98:22-99:7).

By September 2016, Roseman was working an average of 37.5 hours a week at Sam's Club. (Pl.'s Res., Ex. 7). Because this work load was so close to full-time, he spoke to the Human Resources Department about receiving full-time employment status. (Roseman Dep. 125:16-21). He did not receive full-time employment but, at some point, Jeremy Webb did. (Roseman Dep. 128:7-12). On January 17, 2017, HR sent an email to the Sam's Club managers, listing part-time employees who were working more than 34 hours a week, including Roseman. (Pl.'s Res., Ex. 6). HR instructed the managers to ensure that these employees' averages declined to under 30 hours a week. *Id*.

In early 2017, an associate approached Bezzo about an issue that Roseman had been having with stacking his products. Bezzo discussed the issue with Roseman. When Roseman told Bezzo that no one had complained to him about any issues, Bezzo replied that he was "intimidating." (Roseman Dep. 85:22-86:4).

In March 2017, a forklift driver drove "dangerously" close to Roseman as he was operating a "pallet jack." (Roseman Dep. 119:9-120:16). Roseman became distracted and pulled the jack to get out of the way. *Id*. The jack "smashed" his foot, which left a large splinter. *Id*. In agony, Roseman reported his injury to Williams and Bezzo. (Roseman Dep. 200:18-19). Both refused to file a report. (Roseman Dep. 201:1-7).

In the months leading up to May 2017, Bezzo noticed a decline in Roseman's productivity. (Bezzo Dep. 84:24-85:4). This type of productivity dip is normal for a new overnight associate, and usually disappears as the associate gets used to his schedule. (Bezzo Dep. 87:21-88:6).

On May 13, 2017, Bezzo drove a forklift "dangerously close" to Roseman to scold him for

3

his work performance. (Pl.'s Res., Ex. 14).

On May 15, 2017, Bezzo and assistant manager Andy Cripe verbally "coached" Roseman about his performance. (Pl.'s Res., Ex. 5). Bezzo, Cripe, and Roseman discussed Roseman's concern that he was receiving too much work.

On May 18, 2017, Roseman emailed Sam's Club's upper management to complain about Bezzo's "harassment and bullying." (Pl.'s Res., Ex. 17). On June 14, 2017, Roseman met with Store co-manager George Agius to discuss his concerns. (Pl.'s Res., Ex. 18).

After the June 14, 2017 meeting, Roseman continued to receive too much work. At some point after his complaints, the store changed its lunch-time policy to require associates to take their lunch at the same time and in the same place. (Roseman Dep. 177:2-178:4). Roseman had typically taken his breaks in a way to avoid Bezzo, Williams, and others, but this new policy forced him to interact with these people that caused him "distress." *Id*.

The change in Sam's Club's lunch-break policy was the last straw for Roseman. From September 9, 2017 to October 9, 2017, Roseman took an approved leave of absence. During his leave, he submitted a workplace injury report regarding his March 2017 foot injury. (Def.'s Mot., Ex. 17). Sam's Club investigated the report. *Id*. Roseman never returned to work at Sam's Club.

On October 3, 2017, Roseman emailed HR, adding the change in lunch policy to the list of problems that he was having with the company. (Pl.'s Res., Ex. 21). On June 18, 2018, Roseman filed a complaint with Sam's Club's Ethics Hotline. (Pl.'s Res., 23). Sam's Club investigated the ethics complaint, and found that Roseman's claims did not warrant further action. (Ex. 14, Pl.'s Res.)

Shortly after his break from Sam's Club, Roseman began working full-time at Home Depot.

(Roseman Dep. 20:21-21:19). In this position, he earns more per hour than he made at Sam's Club. *Id*.

On July 10, 2018, Roseman filed this lawsuit in Wayne County Circuit Court. He brought eight state-law claims. The first six are based on Michigan's Elliot-Larsen Civil Rights Act of 1976, M.C.L.A. § 37.2110 *et seq*. ("ELCRA"). Three of the ELCRA claims are grounded in racial discrimination: Count I (hostile work environment based on race); Count II (retaliation based on opposition to racial discrimination); and Count III (refusal to promote based on race). The other three ELCRA claims are grounded in height discrimination: Count IV (hostile work environment based on height); Count V (retaliation based on opposition to height discrimination); and Count VI (refusal to promote based on height).

Roseman's two non-ELCRA claims arise under Michigan's Worker's Disability Compensation Act, M.C.L.A § 418.101 *et seq*. ("WDCA"): Count VII (retaliation for exercising rights under WDCA); and Count VIII (discrimination for exercising rights under WDCA).

On August 9, 2018, Sam's Club removed this case to this court, based on diversity of citizenship. (ECF No. 1). Discovery opened on October 12, 2018, and closed on June 10, 2019.

On September 9, 2019, Sam's Club filed this motion for summary judgment. (ECF No. 29). Roseman responded (ECF No. 31), and Sam's Club replied. (ECF No. 34). The Court heard oral argument on February 20, 2020.

## ANALYSIS

**I.** **Applicable Standards**

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists

5

where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving parties bear the burden to show that there is no genuine issue of material fact, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005); *see also Daniels v. Woodside*, 396 F.3d 730, 735 (6th Cir. 2005) ("Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (citations omitted).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, that shows there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586. "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

Michigan's substantive law governs in this diversity case. The Michigan Supreme Court is the controlling authority, *see Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), but if the Michigan Supreme Court has not decided an issue, then the Court "must ascertain the state law from all relevant data." *Orchard Grp., Inc., v. Konica Med. Corp.*, 135 F.3d 421, 427 (6th Cir. 1998) (citations omitted). "Relevant data includes state appellate court decisions, supreme court dicta, restatements of law, law review commentaries, and majority rule among other states." *Id*. The Court should not disregard a state intermediate appellate court's opinion "unless it is convinced by other

persuasive data that the highest court of the state would decide otherwise." *Garden City Osteopathic Hosp., v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (citation omitted).

## II. Harassment

In Count I, Roseman alleges that Sam's Club allowed a hostile work environment based on his race. Compl. ¶ 27. In Count IV, he alleges that Sam's Club allowed a hostile work environment based on his height. Compl. ¶ 44. Under the ELCRA, employer harassment based on race or height is actionable. *See Major v. Village of Newberry*, 316 Mich.App. 527, 550 (2016); *see also* M.C.L.A. 37.2202(1)(a) ("An employer shall not...discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of religion, **race**, color, national origin, sex, **height**, weight, or marital status.") (emphasis added).

"The elements necessary to establish a *prima facie* case of discrimination based on hostile work environment are as follows: (1) the employee belonged to a protected group; (2) the employee was subject to communication or conduct on the basis of his protected status; (3) the employee was subject to unwelcome conduct or communication involving his protected status; (4) the unwelcome conduct was intended to or did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) *respondeat superior*." *Hester v. Department of Corrections*, 2014 WL 2536994 at *2 (Mich. Ct. App. 2014) (citing *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-369 (1996)).

Sam's Club argues that Roseman cannot establish a *prima facie* case of discrimination based on a hostile work environment because (1) he cannot show that he was subjected to conduct based on his race or height, as opposed to his job performance; (2) the alleged conduct was not severe or pervasive enough to establish a hostile work environment; and (3) Roseman cannot establish

7

*respondeant superior* because Sam's Club promptly investigated his complaints. In other words, Sam's Club challenges Roseman's ability to satisfy the second, fourth, and fifth elements of his hostile work environment claims.

### A. Causation (the Second Element)

The second element of Michigan's test for a hostile work environment requires a finding that but for the protected status, the plaintiff would not have been the object of harassment. *Haynie v. State*, 468 Mich. 302, 309 (2003). Sam's Club argues that the only reason that Roseman was subjected to the conduct that he considers "harassment" was because of his poor job performance; put differently, his protected statuses were not the but-for cause of the harassment.

Although Roseman does not offer direct evidence to support this causation element, there are "multiple ways of proving the ultimate question of discrimination in a circumstantial evidence case." *Hecht v. National Heritage Academies, Inc.*, 499 Mich. 586, 607-608 (2016). The Michigan Supreme Court has routinely concluded that evidence of unequal treatment of similarly situated employees can raise an inference of but-for causation:

> A plaintiff can attempt to prove discrimination by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the protected characteristic. An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination. In order for this type of "similarly situated" evidence alone to give rise to such an inference, however, our cases have held that the "comparable" employees must be "nearly identical" to the plaintiff in all relevant respects.

*Id*. at 608 (citations omitted). Roseman bears the burden of showing that the other employees were similarly situated. *Lytle v. Malady*, 458 Mich. 153, 178 n.28 (1998).

Here, Roseman alleges that he was subject to the following harassing conduct: (1) Bezzo required Roseman "to stay past his schedule while he did not require the same from [] Roseman's

8

[] shorter Caucasian coworkers;" (2) Bezzo required Roseman "to work excessive loads without assistance while his shorter Caucasian coworkers were not given such assignments;" (3) Bezzo asked Roseman "what the hell do you want" twice; (4) Bezzo told Roseman that he looked intimidating; (5) Bezzo drove forklifts dangerously close to Roseman, even after his workplace injury, which was caused by a forklift; and (6) Sam's Club changed its lunch-break policy, which then required Roseman to take his break at the same time and in the same place as his alleged harassers. (Pl.'s Res. 18-19).

Notably, Roseman does not point to any other similarly situated employees who were not subjected to the harassing conduct described in sub-paragraphs (3), (4), (5), or (6) of the preceding paragraph. Although this conduct may have been unpleasant, there is no indication that Roseman was targeted for it based on his race or height. *See, e.g., Cline v. Michigan Dept. of Corrections*, 2003 WL 1949555 at *6 (Mich. Ct. App. 2003) ("Anti-discrimination laws are not to be utilized as 'a general civility code designed to purge the workplace of all boorish or even all harassing conduct.'") (quoting *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084 (7th Cir. 2000)).

Roseman tries to point to similarly situated employees for his allegations that he received more work than other employees and was required to stay past his schedule. He testified that "Kim," "Darlene," and Jeremy Webb were Caucasian, shorter employees who were allowed to work together and were assigned less work than he was assigned. (Roseman Dep. 191:5-191:17). However, Roseman only describes how he is different from these employees; he fails to describe any similarities. Accordingly, he has not satisfied his burden to establish that these employees were "nearly identical" to him in "all relevant respects." No reasonable factfinder could infer that Roseman would not have been subjected to the alleged harasment but for his protected statuses and,

9

accordingly, Roseman has failed to satisfy this element of his *prima facie* showing.

**B.     Objectively Hostile Work Environment (the Fourth Element)**

To prevail on a hostile work environment claim, Roseman must present evidence that a reasonable person would find that, under the totality of the circumstances, the comments and conduct directed at him were sufficiently severe or pervasive. *Quinto*, 451 Mich. at 369. In other words, "a hostile work environment claim is actionable when the work environment is so tainted that, in the totality of the circumstances, a reasonable person in the plaintiff's position would have perceived the conduct at issue as substantially interfering with employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v. Everett*, 442 Mich. 368, 372 (1993).

Again, Roseman alleges that he was subject to the following harassing conduct, and argues that this harassment amounts to a hostile work environment: (1) Bezzo required Roseman "to stay past his schedule while he did not require the same from [] Roseman's [] shorter Caucasian coworkers;" (2) Bezzo required Roseman "to work excessive loads without assistance while his shorter Caucasian coworkers were not given such assignments;" (3) Bezzo asked Roseman "what the hell do you want" twice; (4) Bezzo told Roseman that he looked intimidating; (5) Bezzo drove forklifts dangerously close to Roseman, even after his workplace injury, which was caused by a forklift; and (6) Sam's Club changed its lunch-break policy, which then required Roseman to take his break at the same time and in the same place as his alleged harassers. (Pl.'s Res. 18-19).

Although the Court concludes that Roseman has not shown that this conduct was directed at him based on his race or height, *see* Section II(A), if he had, a reasonable person could find that the totality of these circumstances amounted to a hostile work environment. Specifically, Michigan

10

courts have recognized that being assigned too much and/or undesirable work can amount to a hostile work environment. *See Hester*, 2014 WL 2536994 at *1. If this conduct had been based on Roseman's protected statuses, he would have satisfied this element of his hostile work environment claim.

    C.    ***Respondeat Superior* (the Fifth Element)**

For the fifth element, "[*r*]*espondeat superior* liability exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action." *Elezovic v. Bennett*, 274 Mich.App 1, 7 (2007). "[A]n employer may avoid liability if it adequately investigated and took prompt and appropriate action upon notice of the alleged hostile work environment." *Radtke*, 442 Mich. at 396 (quotation marks and citation omitted).

Sam's Club argues that it took prompt and appropriate action after Roseman provided notice of the alleged hostile work environment by way of his May 2017 and June 2018 complaints. Roseman responds that there is a "genuine issue of material fact as to whether [Sam's Club] 'investigated' Mr. Roseman's May 18 and 27, 2017 complaints." (Pl.'s Res. 19). In his response, Roseman does not dispute that Sam Club's investigation into Roseman's June 2018 complaint was promptly and appropriately investigated.

The record is clear that Sam's Club promptly investigated Roseman's May 2017 complaints. In May 2017, Roseman emailed Sam's Club management, complaining about Bezzo's treatment of him. (Pl.'s Res., Ex. 17) The recipient of that email responded roughly 30 minutes later, asking Roseman if he wanted to talk to the Club manager about his allegations. *Id*. Roseman's email was then forwarded to Agius, the Club co-manager. *Id*. Agius discussed Roseman's concerns with his

11

co-manager Rusty Collins and Bezzo,[2] and organized a meeting with Roseman. During this meeting, the two discussed Roseman's concerns, and agreed that Roseman would follow-up with Agius if any issues continued. (Pl.'s Res., Ex. 18). The record lacks any indication that Roseman notified Sam's Club management of any additional harassing behavior until his June 2018 complaint, which he does not dispute was properly handled.

Even viewing these circumstances in Roseman's favor, no rational factfinder could conclude that Sam's Club did not take prompt and appropriate action in response to Roseman's May 2017 complaint. Accordingly, Roseman has failed to satisfy this element of his hostile work environment claims.

### D. Conclusion for Hostile Work Environment Claims

Because Roseman cannot satisfy the "but-for" causation or *respondeat superior* elements of his hostile work environment claims, the Court will grant summary judgment to Sam's Club on Count I and Count IV.

## III. Retaliation

In Count II, Roseman alleges that Sam's Club retaliated against him because he opposed the race-based harassment he was experiencing. In Count V, Roseman alleges that Sam's Club retaliated against him because he opposed the height-based harassment he was experiencing. And in Count VII, Roseman alleges that Sam's Club retaliated against him because he attempted to exercise his rights under the WDCA. Counts I and V arise under the ELCRA, M.C.L.A. 27.2701(a), and Count VII arises under the WDCA, M.C.L.A. 418.301(13).

---

[2] Although Roseman argues that Agius's conversations with Collins and Bezzo were "generalized," he does not appear to dispute that Agius discussed Roseman's concerns with Collins or Bezzo.

A.  **ELCRA Retaliation Claims**

To establish a *prima facie* case of retaliation under the ELCRA, Roseman must show: (1) that he engaged in a protected activity; (2) that this was known by Sam's Club; (3) that Sam's Club took an employment action adverse to him; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Garg v. Macomb County Community Mental Health Services*, 472 Mich. 263, 273 (2005).

For his ELCRA claims, Sam's Club argues that Roseman cannot show that he suffered an adverse employment action or that there was a causal connection between the protected activity and the adverse employment action. Roseman argues that he was subject to two adverse employment actions during his time at Sam's Club: (1) failure to promote him to a full-time position, and (2) constructive discharge. Even assuming that these events amount to adverse employment actions, Roseman has failed to show a causal connection between them and his protected activity.

i.  **Failure to Promote**

Roseman contends that he applied for, and was denied, a full-time position twice: when he first applied for a job in August 2016, and when he contacted HR about transitioning to a full-time position in September 2016. However, even if both of these instances can be properly considered adverse employment actions, they both occurred *before* Roseman first opposed the allegedly discriminatory conduct by emailing a complaint in May 2017. The filing of a complaint in May 2017 could not have caused an adverse employment action that was made months earlier.

ii.  **Constructive Discharge**

"A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."

13

*Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 151 (1992). "[C]onstructive discharge is the equivalent of being fired." *Chema v. Michigan Cancer Specialists*, *PLC*, 2019 WL 938856 at *6 (Mich. Ct. App. 2019). Because whether a plaintiff has been constructively discharged is a fact-based inquiry, it is usually an issue for the jury to decide. *Id*. (citing *Manning v. City of Hazel Park*, 202 Mich.App. 685, 698 (1993)).

Viewing the evidence in Roseman's favor, a jury could find that the combination of the conditions that he argues was imposed on him (excessive work, compulsory unpaid overtime, abrasive comments, etc.) amounted to a constructive discharge. However, Roseman also runs into a causal connection problem here because virtually all of the conditions he complains of began before his May 2017 complaint. He testified that he received too much work and too little assistance, and was consistently forced to stay late, beginning on his second day of work. And the abrasive comments and incidents of Bezzo's dangerous forklift driving occurred before he engaged in any protected opposition activity. These conditions cannot be said to have occurred because of Roseman's filing of a complaint.

The only condition that was imposed after Roseman's complaint is the "change" in lunch-break policy. However, "the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Pena v. Ingham County Road Com'n*, 255 Mich.App. 299, 312 (2003). A lunch-break policy that asks employees to take breaks at the same time and in the same area, standing alone, is not so intolerable that it could cause a constructive discharge.

### iii. Conclusion for ELCRA Retaliation Claims

Because Roseman cannot establish a causal connection between his protected activity and

14

conditions that could be considered adverse employment actions, the Court will grant summary judgment to Sam's Club on Counts II and V.

### B. WDCA Retaliation

To establish a *prima facie* case of retaliation under the WDCA, an employee who has suffered a work-related injury must present evidence: (1) that the employee asserted a right protected by the WDCA, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected. *Cuddington v. United Health Services, Inc.*, 298 Mich.App. 264, 275 (2012).

Sam's Club argues that Roseman cannot establish that he asserted a right protected by the WDCA, that Sam's Club took an employment action adverse to him, or that any adverse action was causally connected to his protected activity.

#### i. Protected Activity

The WDCA "creates a cause of action when an employer terminates or otherwise discriminates against an employee in retaliation (1) for filing a complaint under the WDCA, (2) for instituting or causing a proceeding to be instituted under the WDCA, or (3) "because of the exercise by the employee ... of a right afforded by this act." *Cuddington*, 298 Mich.App. at 272 (quoting M.C.L.A. § 418.301(13)). Although activity protected by the WDCA includes any "right afforded by th[at] act," it appears that Michigan courts have only recognized one right besides filing a complaint or causing formal proceedings to be instituted: the right to seek reasonable and necessary medical services. *Id.* at 280.

15

"Importantly, 'a cause of action for retaliatory discharge cannot be based on the anticipated exercise of a right afforded under the [WDCA].'" *Donald v. Anna's House Kalamazoo LLC*, 2019 WL 2439047 at *2 (Mich. Ct. App. 2019) (per curiam) (quoting *Cuddington,* 298 Mich.App. at 280) "Rather, the employee bringing a claim for retaliatory discharge must show that he or she first exercised such a right, and that, subsequently, the employer terminated or otherwise discriminated against the employee in response to that conduct." *Id*. (quotations omitted).

Here, Roseman contends that he initially "reported" his March 2017 foot injury to Williams, who replied that he was not the person who could file a report, and directed Roseman to Bezzo. Roseman then informed Bezzo, who refused to file a report even though Roseman insisted. Bezzo also refused to give Roseman the necessary paperwork to file a report himself, and stated that any report would cost the company money. Viewing these facts in Roseman's favor, he might have engaged in a protected activity by reporting his injury to his direct supervisors, which could be construed as raising a complaint covered by the WDCA or seeking medical services.

### ii. Adverse Employment Action and Causal Connection

Roseman again argues that he suffered two adverse employment actions: failure to promote and constructive discharge. For the same reasons articulated in Section III(A)(i)-(ii), he has failed to show that these alleged adverse employment actions were causally connected to his exercise of his rights under WDCA. The two failures to promote occurred before his March 2017 accident. And most of the conditions related to his "constructive discharge" began before his accident. The only conditions that did not were the changed lunch-break policy, and an isolated incident of Bezzo driving too close to Roseman. These events together are not so "intolerable" as to amount to a constructive discharge.

### iii. Conclusion for WDCA Retaliation Claim

Because Roseman cannot establish a causal connection between his possibly protected activity and conditions that could be considered adverse employment actions, the Court will grant summary judgment to Sam's Club on Count VII.[3]

## III. Failure to Promote

In Count III, Roseman alleges that Sam's Club refused to promote him because of his race. In Count VI, Roseman alleges that Sam's Club refused to promote him because of his height.

To establish a *prima facie* case of discrimination based upon a failure to promote, Roseman must show that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir.2003); *see also Hazle v. Ford Motor Co.*, 464 Mich. 456, 463 (2001) (setting forth substantively similar elements for a claim of failure to promote under the ELCRA).

Roseman's claims for failure to promote have an obvious, fatal flaw: there is no evidence that he ever applied for a promotion. Although Roseman testified that he spoke with HR "about a full-time position," he never filed a formal application—unlike Jeremy Webb, the shorter, Caucasian employee who Roseman attempts to compare himself to. (Def.'s Mot., Ex. 19). Because Roseman has failed to show that he applied for a promotion, or that he was treated differently than any other

---

[3]In Count VIII, Roseman alleges that Sam's Club "discriminated against [him] for exercising rights provided under the WDCA." Compl. ¶ 62. The Court cannot discern how this claim is different from Count VII (the WDCA retaliation claim). Accordingly, the Court's disposition of Count VII also disposes of Count VIII.

similarly situated employee who did not apply for a promotion, the Court will grant summary judgment in favor of Sam's Club on Counts III and VI.

## CONCLUSION

For the reasons above, the Court **GRANTS** Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

s/Sean F. Cox  
Sean F. Cox  
United States District Judge

Dated: March 5, 2020